**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
_____

BRUCE D. KNIGHT and
NORTHWAY EXHIBIT MARKETING, INC.,
d/b/a Lincoln Studios Midwest and
Vertex Exhibits,

    Plaintiffs,


v.         **MEMORANDUM OF LAW & ORDER**
           Civil File No. 03-6443 (MJD/JGL)


PRODUCTION RESOURCE GROUP, LLC,
HAAS MULTIPLES ENVIRONMENTAL
MARKETING & DESIGN, INC., d/b/a
Entolo-Minneapolis, and ENTOLO, INC.,

    Defendants.
_____

George G. Eck, Andrew J. Holly, and Kimberly A. Fuhrman, Dorsey & Whitney,
Counsel for Plaintiffs.

Thomas H. Boyd and Karl E. Robinson, Winthrop & Weinstine, and Randall L.
Sarosdy, Akin Gump Strauss Hauer & Feld, Counsel for Defendant Production
Resource Group, LLC.
_____

## I. INTRODUCTION

This matter is before the Court on Defendant Production Resource Group,

LLC's Motion for Summary Judgment.  [Docket No. 44]  The Court heard oral

argument on May 20, 2005.

## II.   FACTUAL BACKGROUND

### A.   Northway Purchase

In 1982, Plaintiff Bruce D. Knight incorporated Plaintiff Northway Exhibit Marketing, Inc. ("Northway"), which designed and created trade show displays. Knight Dep. at 10:20-22; 48:2-17.  On August 2, 1999, after negotiations with Thomas Van Hercke, an employee of Production Resource Group LLC ("PRG"), Knight agreed to sell his business to Haas Multiples Environmental Marketing and Design, Inc. ("Haas").  Id. at 22:21-23:24, 88:8-17; Exhs. 2, 5 to Boyd Aff.  Haas is a Minnesota corporation involved in the retail and trade show business.  PRG, a limited liability company organized under Delaware law that provides goods and services to the entertainment industry, had acquired Haas on November 30, 1998. Exhs. 15 & 16 to Boyd Aff.  Entolo, Inc., is a Delaware corporation, incorporated on December 21, 2001.  Exh. 30 to Boyd Aff.  Haas was Entolo's principal shareholder.  Exh. 32 to Boyd Aff.

The Acquisition Agreement between Haas and Northway provided that in exchange for all of Northway's assets, Haas would provide Knight a cash payment of between $500,000 and $750,000 in 2002 (the "Earn-Out Payment").  ¶ 1.5 Exh. 2 to Boyd Aff.  Additionally, Haas hired Knight under an Employment Agreement. Exh. 5 to Boyd Aff.  Both agreements were fully integrated contracts.  Exh. 2 ¶ 14.7 to Boyd Aff.; Exh. 5 ¶ 7.1 to Boyd Aff.  PRG was not a party to either

2

contract, although it was explicitly named as a party to another contract executed

on August 2, 1999, involving Haas's assumption of Northway's lease.  Assignment,

Assumption and Amendment of Net Lease, Exh. 6 to Boyd Aff.

On January 17, 2002, the Acquisition Agreement was amended so that the

Earn-Out Payment was set at $625,000.  This change was reflected in the First

Amendment to the Acquisition Agreement, to which Knight, Northway, Haas, and

Haas's successor, Entolo, were parties.  Exh. 10 to Boyd Aff.  PRG was not listed as

a party to the Amendment.  According to Knight, before he signed the

Amendment, the President and CEO of Entolo, Thomas Vogt, told him that PRG

would place the debt to Knight on its books.  Knight Dep. at 193:16-95:5.  Vogt

relied on instruction from PRG Chief Financial Officer, Kevin Baxley, to make that

statement.  Vogt Dep. at 92:2-93:3.

### B.    GMAC Financing Agreement

When PRG acquired Haas, Haas became a party to PRG's Bank of New York

loan and all of Haas's assets were pledged as collateral under that agreement.

Baxley Dep. at 63:13-64:6; Exh. 12 to Boyd Aff.  Exh. 40 to Boyd Aff.  In February

2001, PRG refinanced the Bank of New York loan by entering into two loan

agreements with GMAC Business Credit, a $50 million term loan and

approximately $70 million in revolving credit.  Revolving Loan and Security

Agreement, Exh. 36 to Boyd Aff.; Skaferowsky Aff. ¶ 4, Exh. 38 to Boyd Aff.; Exh.

3 to Skaferowsky Dep., Exh. D to Fuhrman Aff; Baxley Decl. ¶ 16, Exh. 40 to Boyd Aff.

Haas, and later Entolo, were both parties to the GMAC agreement and pledged their assets to secure the funding of the revolving loan.  Baxley Dep. at 44:24-45:16, 50, Exh. E to Fuhrman Aff.  Under the agreement, Haas and Entolo sent all of their receivables and creditor payments to a PRG "lockbox" bank account.  Revolving Loan and Security Agreement ¶ 4.15(h).  See also Schreyer-Pederson Dep. at 69:20-70:25, Exh. J to Fuhrman Aff.; Baxley Dep. at 97:3-98:22. GMAC swept the cash out of the PRG account at the end of every business day. Baxley Dep. at 97:5-9.  Although Haas and Entolo were required to place all of their cash into the lockbox bank account, they did not have the ability to request loan proceeds from GMAC.  Arrett Dep. at 23:14-26:25, Exh. C to Fuhrman Aff.; Grow Dep. at 22:10-24:24, Exh. F to Fuhrman Aff.  Instead, they had to request a disbursement from PRG.

Each week, PRG would hold a weekly telephone conference that included representatives of various PRG divisions and subsidiaries.  Hansen Dep. at 23:22-27:21, Exh. H to Fuhrman Aff.; Arrett Dep. at 38:25-44:25.  Before the meeting, PRG had already determined the amount it would borrow under the GMAC revolving credit agreement, and at the meeting, the participants would decide how to allocate that amount among PRG's divisions and subsidiaries.  Id.; Hansen

4

Dep. at 32:8-23, 34:1-35:22.

Haas did not receive enough funds to run its business, and some suppliers refused to provide services to it.  Arrett Dep. at 46:23-48:1; Van Hercke Dep. at 47:12-19, 61:7-24, 73:13-23.  Overall, from January 2001 through April 2001, PRG collected approximately $6 million more than it paid Haas in GMAC funds. Nicholson Aff. ¶ 13; Nicholson Report at 3.  PRG then returned $1.7 million of the money received from Haas by December 2003, but from October 2002 through February 2003, PRG received an additional $1.7 million from Haas.  Nicholson Aff. ¶ 16; Nicholson Report at 3.

According to PRG's comptroller, PRG managed its subsidiaries and its divisions in the same manner.  Hansen Dep. at 57:9-13, Exh. H to Fuhrman Aff. Additionally, Haas and PRG were represented to the public as a single corporate entity.  Hovis Dep. at 151:21-52:7, Exh. G to Fuhrman Aff.  Employees from one subsidiary or division of PRG sometimes worked for other divisions of PRG.  Arrett Dep. at 113:14-16:13, Exh. C to Fuhrman Aff.  Haas's and Entolo's financial statements were consolidated with PRG's.  PRG and Subsidiaries Consolidated Financial Statements, Exh. U to Fuhrman Aff.  PRG management regularly directed the firing of Haas and Entolo employees, against the wishes of Haas's and Entolo's management.  Schreyer-Pederson Dep. at 78:5-79:22; Van Hercke Dep. at 78:6-80:25; Grow Dep. at 38:14-39:3.  PRG controlled Haas's and Entolo's

budgets, salaries, layoffs, significant expenditures, and revenue goals.  Leistikow

Dep. at 38:24-40:23, 84:18-85:19, Exh. I to Fuhrman Dep.; Van Hercke Dep. at

71:15-73:4, 95:14-96:15; Vogt Dep. at 160:4-62:15.; Arrett Dep. at 62:16-65:24;

Knight Dep. at 157:11-22, Exh. A to Fuhrman Aff.  Entolo had no shareholder

meetings, had no board meetings, and provided no dividends.  Arrett Dep. at

86:20-87:23.  Haas never held any board meetings.  Van Hercke Dep. at 48:19-

51:1; Grow Dep. at 53:15-25.  Van Hercke claimed to not even know that he was a

member of the Haas board of directors because he was never invited to a board

meeting.  Van Hercke Dep. at 48:19-51:1.

### C. Earn-Out Payment

Knight's Earn-Out Payment of $625,000 was due on October 19, 2002.  Exh.

10 to Boyd Aff.  In September 2002, Judy Arrett, Haas's controller, informed

Knight that PRG would deposit the money in Knight's account on that date.

Knight Dep. at 202:7-03:14, Exh. 1 to Boyd Aff.  However, on October 19, Knight

did not receive his Earn-Out Payment.  John Hovis, of PRG, told Knight that Jere

Harris of PRG would be "reaching out" to present a payment plan.  Id. at 207:22-

25.  However, Harris then told Knight that he would not pay him and that he

might have to sue in order to recover his money.  Id. at 208:6-16.  PRG then

refused to allow any disbursement to Haas to pay Knight, against the wishes of

Haas's management.  Arrett Dep. at 15:3-20; Leistikow Dep. at 121:9-21, Exh. I to

Fuhrman Aff.

### D.    Liquidation of Haas/Entolo

In 1998, when PRG acquired Haas, Haas had $38 million in revenue, $1 million in cash, and net earnings of twelve percent.  Van Hercke Dep. at 16:10-19:7.  In December 2001, PRG incorporated Entolo, Inc.  Entolo was Haas's successor, and Haas owned a majority of Entolo's shares.  According to PRG's expert, Haas and Entolo both experienced a decline in business due to September 11, 2001, and weakening business conditions in the trade show and retail business.  McCloskey Report at 10-11, Exh. 44 to Boyd Aff.

During the summer of 2002, PRG directed Haas and Entolo to embark on an aggressive collection of their receivables.  Schreyer-Pederson Aff. ¶¶ 8-9, Exh. 2 to Schreyer-Pederson Dep., Exh. J to Fuhrman Aff.  The collected funds were sent to PRG's bank account.  Id.  PRG did not allow Haas or Entolo to pay their vendors, except for individuals necessary to the liquidation process.  Schreyer-Pederson Aff. ¶¶ 9-10.  While liquidating Haas and Entolo, from October 31, 2002, at which time Entolo was insolvent, to February 28, 2003, PRG collected $1.7 million from Haas Nicholson Aff. ¶¶ 15-16, Exh. N to Fuhrman Aff.; Nicholson Report at 3, Exh. M to Fuhrman Aff.;  Schreyer-Pederson Aff.¶ 10; Arrett Dep. at 81-82.  During that time, PRG provided severance packages to Haas and Entolo personnel Vogt and Arrett.  Email Regarding Vogt 12/02 Severance, Exh. T to Fuhrman Aff; Arrett

Dep. at 10:2-8, 16:6-14.  Haas and Entolo are now insolvent and are no longer operating.

### E.   Settlement Agreement and Current Action

In December 2002, Knight and Northway sued Haas, Entolo, and PRG in Hennepin County District Court.  The district court ordered Knight, Northway, Haas, and Entolo into arbitration and stayed the litigation against PRG.  In 2003, Knight, Haas, and Entolo entered into a stipulated arbitration award.  Exh. 42 to Boyd Aff.  Pursuant to that agreement, the court entered judgment against Haas and Entolo, jointly and severally, in the amount of $750,000 for their breach of the Acquisition and Employment Agreements.  Id.  PRG subsequently removed the remaining case to this Court.  In their First Amended Complaint [Docket No. 19], Plaintiffs allege Count I, Breach of Contract/Piercing PRG's Corporate Veil; and Count II, Fraudulent Transfer.  PRG now moves for summary judgment on both claims against it.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

8

summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." <u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.    Minnesota Fraudulent Transfer Act

### 1.    Requirements of the Minnesota Fraudulent Transfer Act

The Minnesota Fraudulent Transfer Act, Minn. Stat. §§ 513.41-.51 ("MFTA"), prevents debtors from placing assets that are available to pay debts beyond their creditors' reach.  <u>In re Butler</u>, 552 N.W.2d 226, 232 (Minn. 1996).  A "threshold question" under the MFTA is "whether a particular event qualifies as a 'transfer' within the purview of the Act.  'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.'"  <u>Id.</u> at 231-32 (quoting Minn. Stat. § 513.41(12)).  In order to determine whether a "transfer" occurred, the Court must first determine whether the property at issue constituted "assets" under the definition provided in the MFTA.  <u>In re Wintz Cos.</u>, 230 B.R. 848, 860 (B.A.P. 8th Cir. 1999).

### 2.    Whether the Property at Issue Constitutes Assets

Plaintiffs assert that PRG negotiated the GMAC financing agreement so that

Haas and Entolo took on PRG's debt and surrendered all of their receivables in order to service PRG's debt.  Then PRG took assets from Entolo and Haas and did not allocate sufficient loan proceeds to them.

The property alleged to have be fraudulently transferred to PRG, Haas's and Entolo's assets, was encumbered by GMAC's valid lien and enforceable security interest; therefore, the property did not constitute "assets" under the statute. Under the MFTA, "'[a]sset' means property of a debtor, but the term does not include: (i) property to the extent it is encumbered by a valid lien . . ."  Minn. Stat. § 513.41(2).  A lien is "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement." § 513.41(8).

Assets encumbered by a valid lien are not "assets" under the statute, and, thus, no "transfer" of those assets can occur under the MFTA.  In re Wintz Cos., 230 B.R. 848, 860 (B.A.P. 8th Cir. 1999); Lorenz Bus Serv., Inc. v. Richfield Bus Co., No. C2-02-56, 2002 WL 2005468, at *4 (Minn. Ct. App. Sept. 3, 2002) (unpublished).  At all relevant times, GMAC had a lawful security interest and held a valid lien on all property transferred by Haas and Entolo.  Thus, that property cannot constitute an asset, and there can be no transfer to any party under the MFTA.

### 3.      Whether the GMAC Agreement Itself Constituted a Fraudulent Transfer

Plaintiffs also allege that the GMAC Agreement itself was a fraudulent transfer.  They note that the decision to guarantee a loan agreement can constitute a "transfer" of assets under the MFTA.  Minn. Stat. § 513.41(12).  Plaintiffs' theory that the GMAC lien itself was fraudulent was not pled in their First Amended Complaint.

In order to challenge the validity of the lien, Plaintiffs must initiate an action against GMAC itself.  United States v. Perry, 360 F.3d 519, 525 n.4 (6th Cir. 2004) (noting that a lienholder has a due process right to notice of a proceeding that would deprive it of its interest); In re Henline, 242 B.R. 459, 465 (Bkrtcy. D. Minn. 1999) ("[A] lien is an interest in property protected by the due process guarantees of . . . the United States Constitution.  Threshold constitutional due process guaranties require the affected lienholder's participation in a proceeding that results in the taking of the lienholder's interest in property.").  Like the lender in Lorenz Bus Service, GMAC "is not a party to the lawsuit and has never been given an opportunity to defend the implication that it has acted improperly or fraudulently or to explain the commercial reasonableness of its actions," and GMAC was not a debtor to PRG and did not transfer the collateral to an insider at PRG.  Lorenz Bus Serv., 2002 WL 2005468, at *5-*6.  The Court cannot set aside GMAC's lien when GMAC is not a party to this lawsuit.  Additionally, there is

11

insufficient evidence in the record to support a finding that the execution of the GMAC agreement was, itself, a fraudulent transfer.

### 4.   Whether Haas and Entolo Transferred Assets Directly to GMAC

Plaintiffs also argue that Haas and Entolo did not transfer their receivables directly to GMAC.  Rather, they transferred their receivables to PRG's account, and they were then transferred to GMAC.  Plaintiffs assert that, because PRG did not have a valid lien on Haas's or Entolo's receivables, this first "transfer" did not occur pursuant to a valid lien, and thus it was a "transfer" of "assets" under the MFTA.

The record does not support the proposition that the funds deposited into the account actually went to PRG instead of to GMAC.  Under the GMAC Agreement, Haas's and Entolo's receivables became GMAC's property once they entered the locked account.  GMAC Revolving Loan and Security Agreement § 4.15(h).  Even under Plaintiffs' version of the facts, PRG was a "mere conduit" in connection with the transfer of the funds.  See In re Circuit Alliance, Inc., 228 B.R. 225, 232-33 (Bankr. D. Minn. 1998) (noting that, under bankruptcy law, there is no "transfer" when the debtor's funds enter the possession of a "mere conduit," who does not have a discretionary legal right to dispose of the funds but, instead, merely holds the funds in trust for the party that actually receives the legal interest).  In this case, PRG fits the definition of a mere conduit: when it received

12

Haas's and Entolo's funds in the locked account, it "was acting solely as an intermediary, without a legal interest in the funds and certainly without authority to direct them to [its] own uses." Id. at 233 (footnote omitted). In any case, whether the funds went first to GMAC or to PRG, the funds were encumbered by GMAC's valid lien and, thus, were not assets under the MFTA, and transfers to any party are not covered by the MFTA. In re Wintz Cos., 230 B.R. 848, 860 (B.A.P. 8th Cir. 1999).

Because there was no transfer of assets, Plaintiffs' MFTA claim cannot survive. Defendants' motion for summary judgment is granted as to Count II.

**C.     Piercing the Corporate Veil**

**1.     Standard for Piercing the Corporate Veil**

The decision of whether to pierce the corporate veil is determined under state law. Stoebner v. Lingenfelter, 115 F.3d 576, 579 (8th Cir. 1997). In this case, the parties agree that Minnesota law applies, and that Delaware law is substantially similar.

> Generally, absent fraud or bad faith, a corporation will not be held liable for the acts of its subsidiaries. There is a presumption of separateness the plaintiff must overcome to establish liability by showing that the parent is employing the subsidiary to perpetrate a fraud and that this was the proximate cause of the plaintiff's injury.

Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc., 553 N.W.2d 446, 449 (Minn. Ct. App. 1996) (citation omitted). When deciding whether to pierce the

corporate veil, the Court must

> 1) analyze whether the corporation functioned as the mere
> instrumentality of the principals a party is attempting to reach by
> piercing the corporate veil, and 2) determine whether injustice or
> fundamental unfairness would occur if the corporate veil were left
> intact.

Stoebner, 115 F.3d at 579 (citing, e.g., Victoria Elevator Co. v. Meriden Grain Co.,

283 N.W.2d 509, 512 (Minn. 1979)).  In determining the first prong, the Court

examines factors such as

> insufficient capitalization for purposes of corporate undertaking,
> failure to observe corporate formalities, nonpayment of dividends,
> insolvency of debtor corporation at time of transaction in question,
> siphoning of funds by dominant shareholder, nonfunctioning of other
> officers and directors, absence of corporate records, and existence of
> corporation as merely facade for individual dealings.

Victoria Elevator Co. of Minneapolis, 283 N.W.2d at 512.

Minnesota law permits veil piercing in order to establish contract liability.

See, e.g., id. at 510, 513 (piercing the corporate veil on a breach of contract

claim).  Finally, the Court notes that "[p]iercing the corporate veil is an exception

to be used only under limited circumstances."  Groves v. Dakota Printing Servs.,

Inc., 371 N.W.2d 59, 62 (Minn. Ct. App. 1985).

### 2.    Application to Facts

#### a.    Whether Haas and Entolo Were Instrumentalities of PRG

PRG asserts that it had a lawful right to operate and manage Haas, and

later, Entolo.  Haas Bylaws Art. I § 1, Exh. 14 to Boyd Aff.  It asserts that Haas and

Entolo had valid boards of directors, Exhs. 27-29, 32-33 to Boyd Aff., who took

action through written unanimous consent.  See, e.g., Exhs. 26-28, 31-32 to Boyd

Aff.  Under Minnesota law, written consent has the same force and effect as an

action taken in a board meeting.  Minn. Stat. § 302A.239, subd. 1, 2; see also Haas

Bylaws, Art. I, § 13.

In this case, Haas's and Entolo's boards of directors unanimously consented

to be co-borrowers under the GMAC Agreement.  Haas Consent to GMAC Loans,

Exhs. 19-20 to Boyd Aff.; Haas Consent to Substitution of Entolo, Exh. 26; Entolo

Consent to GMAC Loan, Exh. 35.  PRG notes that, although Van Hercke now

claims that he did not know that he was a member of Haas's board of directors, he

signed unanimous board consents as a member of Haas's board.  See, e.g., Exhs.

17-20, 27.

PRG also notes that an "increase in control by the parent constitutes a

reasonable reaction of a parent to its failing subsidiary."  Ass'n of Mill & Elevator

Mut. Ins. Co., 553 N.W.2d at 450.  It asserts that most of PRG's extensive control

over Haas and Entolo occurred when they, too, were struggling financially.

The evidence before the Court raises a genuine issue of material fact

regarding whether PRG insufficiently capitalized Haas and, later, Entolo.  There is

evidence that Entolo did not pay dividends.  Viewing the evidence in the light

most favorable to Plaintiffs, there is sufficient evidence that PRG siphoned funds from Haas and Entolo by collecting their receivables as collateral and then granting them few loan proceeds.  Van Hercke's testimony that he did not know that he was on Haas's board of directors raises questions about the functioning of Haas's board.  Finally, PRG exercised almost complete control over the operations of Haas and Entolo and used their employees and assets to operate PRG and its other affiliated companies.

On the other hand, Haas was not insolvent at the time of the initial Acquisition and Employment Agreement, and Entolo was not insolvent at the time Plaintiffs' signed the Amendment.  Although Haas and Entolo did not hold board meetings, they did follow some corporate formalities, have officers and directors, and maintain at least some corporate records, as shown by the evidence of actions taken by unanimous written consent.

Viewing the evidence in the light most favorable to Plaintiffs, the Court determines that, weighing the above factors, it could find that Haas and Entolo were mere instrumentalities of PRG.  The Court concludes that Plaintiffs have raised genuine issues of material fact as to the first prong of the veil-piercing test. The Court now turns to the second prong of the test.

**b.      Whether the Failure to Pierce Would Cause Injustice**

Plaintiffs note that they do not need to demonstrate that PRG engaged in fraud.  Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc., 283 N.W.2d 509, 512 (Minn. 1979).  Rather, they must simply show that, to allow the corporate veil to remain in place would create "an element of injustice or fundamental unfairness."  Id.

PRG argues that the GMAC agreement cannot constitute malfeasance because "joint credit agreements are an inevitable consequence of a parent-subsidiary relationship."  Am. Commercial Lines, Inc. v. Ostertag, 582 S.W.2d 51, 53 (Ky. Ct. App. 1979).  According to PRG's expert witness, this lockbox arrangement, with multiple borrowers but only a single borrowing agent, the parent company, is a conventional and accepted method of borrowing.  Adams Report  ¶ 12, Exh. 43 to Boyd Aff.  Additionally, Minnesota courts have held that there is no inherent unfairness is paying proceeds to a secured bank during liquidation and leaving nothing for unsecured creditors.  Ass'n of Mill & Elevator Mut. Ins. Co., 553 N.W.2d at 450.  However, in Association of Mill & Elevator, although the parent exercised some control over its subsidiary, it also infused cash into its subsidiary.  Additionally, the plaintiffs did not assert "that the initial decision to obtain the line of credit was improper."  Id. at 448.  Here, Haas and Entolo were guarantors on PRG's loan and had no control over requesting loan proceeds.  PRG, not Haas or Entolo, benefitted from the GMAC loan.  Plaintiffs do

17

assert that GMAC loan was improper.  Additionally, PRG specifically promised to pay Haas and Entolo's unsecured debt to Knight.

PRG also asserts that Knight was a sophisticated, represented party who signed a written contract that clearly indicated that the agreement was with a corporation: Haas and, later, Entolo.  See Groves v. Dakota Printing Servs., Inc., 371 N.W.2d 59, 63 (Minn. Ct. App. 1985)  (holding that there was no injustice where "[t]his was a commercial transaction, and [the plaintiffs] knew they were dealing with a corporation . . .").  While it is true that Knight is an experienced businessman who was represented by counsel in his contract dealings with Haas, Entolo, and PRG, unlike in Groves, he has produced evidence that, before he signed the Amendment, PRG explicitly represented to him that it would take responsibility for his Earn-Out Payment.  Viewing the facts in the light most favorable to Plaintiffs, it would be fundamentally unfair for PRG to treat Haas and Entolo as mere instrumentalities, deliberately siphoning money from them, and, at the same time, induce Knight to become a creditor of Haas and Entolo by creating the belief that PRG would ensure payment, when it knew that its own actions would prevent them from fulfilling their debt to Knight.

The Court concludes that Plaintiffs have raised a genuine issue of material fact on their claim for piercing the corporate veil.  Defendant' motion for summary judgment on Count I, Breach of Contract/Piercing PRG's Corporate Veil, is denied.

18

### D.      Damages

PRG requests that, if the Court denies summary judgment on the veil-piercing claim, the Court limit Plaintiffs' damages claim to the amount in the state court stipulated judgment against Haas and Entolo, $750,000.

### 1.      Attorney's Fees

Plaintiffs have conceded that their damages claim is capped at $750,000 by their stipulated judgment against Haas and Entolo.  However, Plaintiffs assert that they are entitled to recover attorney's fees incurred after the state court judgment from PRG beyond the stipulated judgment amount.  They note that the Acquisition Agreement states that Haas and Entolo will indemnify Knight for all damages, including "reasonable attorneys' fees," that he incurred based on "any breach by Haas of any covenant or obligation of Haas in this Agreement."  Exh. 2 to Boyd Aff. §§ 11.2, 11.4(b).

Plaintiffs did not reserve any claims for attorney's fees in the Acquisition Agreement in the stipulated judgment.  Thus, the final judgment covers all aspects of Haas's and Entolo's alleged breach of the Acquisition Agreement, including any attorney's fees.  Plaintiffs have asserted no right to attorney's fees apart from the contract.  Any right to recover on the breach of contract claim from PRG through piercing the corporate veil is based solely on Haas's and Entolo's liability, and that liability has already been fixed.  Thus, Plaintiffs cannot

recover damages beyond $750,000 against PRG if the corporate veil is pierced.

### 2.   Exemplary Damages

Plaintiffs request for "exemplary damages" must be stricken because they have brought no formal motion asserting punitive damages under Minnesota Statute sections 549.191-.20, and the deadline for motions to amend the pleadings has now past.  See also  Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004, 1009 (D. Minn. 2003) (citation omitted).  Plaintiffs appear to have abandoned their exemplary damages claim.  In any case, their claim is barred by their failure to comply with the Minnesota statute.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

Defendant Production Resource Group, LLC's Motion for Summary Judgment [Docket No. 44] is **GRANTED IN PART** and **DENIED IN PART** as follows:

> The motion is **DENIED** as to Count I of the First Amended Complaint, Breach of Contract/Piercing PRG's Corporate Veil.

> The motion is **GRANTED** as to Count II of the First Amended Complaint, Fraudulent Transfer, and Count II is **DISMISSED WITH PREJUDICE**.

> Plaintiffs' damages claim against Defendant Production Resource

Group is limited to seven hundred fifty thousand dollars ($750,000).

Dated: July 8, 2005

s/ Michael J. Davis
Judge Michael J. Davis
United States District Court